UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| WELLS FARGO BANK, N.A., as Trustee, | : |
| | : |
| Interpleader Plaintiff, | :   Case No. _____ |
| | : |
| v. | : |
| | : |
| WATERFALL ASSET MANAGEMENT, LLC, | : |
| THE BANK OF NEW YORK MELLON, and | : |
| CEDE & CO., | : |
| | : |
| Interpleader Defendants. | : |

---

# INTERPLEADER COMPLAINT

Interpleader Plaintiff Wells Fargo Bank, National Association ("Wells Fargo"), a national banking association, in its capacity as Trustee[1] under the Indenture (the "Indenture") dated November 18, 2004, by and among itself, and Tropic CDO IV Ltd. (the "Issuer") and Tropic CDO IV Corp. (the "Co-Issuer"; together, the "Co-Issuers"), alleges and states that:

## INTRODUCTION

1. This is an interpleader action brought to obtain adjudication of the rights of the Interpleader Defendants with respect to certain payments to be made pursuant to the Swap Agreement between the Issuer and The Bank of New York Mellon ("BNYM" or the "Swap Counterparty"). Wells Fargo, in its capacity as Trustee for the collateralized debt obligation governed by the Indenture (the "Tropic CDO IV"), faces competing demands by certain Interpleader Defendants with respect to such payments and cannot determine, without hazard to itself, how to proceed.

---

[1] All capitalized terms used, but not defined herein, shall have the meanings ascribed to them in the Indenture or, if not defined therein, the Swap Agreement. Copies of the Indenture and Swap Agreement are attached hereto as Exhibits A and B, respectively.

2. In September 2017, BNYM designated a partial termination of the Swap Agreement based on the redemption of Notes by the Issuer. In accordance with the Swap Agreement, BNYM, as Calculation Agent, calculated that it was to be paid by the Issuer a termination amount of $3,166,500 (the "Partial Termination Amount") on the next payment date, October 16, 2017. The Priority of Payments in the Indenture provides that the Partial Termination Amount is to be paid *pari passu* with the interest due to the Class A-1L and Class A-2L Noteholders (collectively, the "Senior Class A Noteholders").

3. The monies available for distribution on the October 16, 2017 payment date were insufficient to pay both the Partial Termination Amount and the interest due to the Senior Class A Noteholders in full. The failure to pay interest in full to the Senior Class A Noteholders would result in an Event of Default under the Indenture. Therefore, at the request of the Issuer, BNYM consented to a deferral in the payment of the portion of available funds that were to have been allocated to the Partial Termination Amount in order for the interest payable to the Senior Class A Noteholders to be paid in full.

4. The day after the October payment date, BNYM declared that an Event of Default under the Swap Agreement had occurred due to the fact that the Issuer failed to pay the Partial Termination Amount in full. BNYM calculated that it was to be paid by the Issuer on the next Payment Date certain additional termination amounts, which, when added to the existing unpaid Partial Termination Amount, totaled $6,909,048.75 (the "Final Termination Amounts").

5. After receiving notification of the Event of Default under the Swap Agreement, Noteholder Waterfall Asset Management, LLC ("Waterfall") alleged that BNYM failed to comply with certain obligations under the Swap Agreement; thus, according to Waterfall, BNYM's partial termination of the Swap Agreement was invalid and, in turn, its declaration of

an Event of Default under the Swap Agreement based on the Issuer's non-payment was likewise invalid.

6. Waterfall has demanded that the Trustee act to enforce the Issuer's rights under the Swap Agreement, including challenging BNYM's purported improper termination and certain termination amounts. BNYM has demanded payment of the Final Termination Amounts on the next payment date, January 15, 2018. These demands are inconsistent with one another, and the Trustee cannot determine without risk of legal liability to itself what amounts, if any, are owed to BNYM. Accordingly, the Trustee brings this Interpleader Action to resolve the dispute.

## JURISDICTION AND VENUE

7. This is an action for interpleader pursuant to Federal Rule of Civil Procedure 22. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because there is a diversity of citizenship between the Interpleader Plaintiff and Interpleader Defendants, and the value of the disputed item of Portfolio Collateral exceeds $75,000 exclusive of interest and costs.

8. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391(b)(3) because venue is not proper in any other judicial district and, upon information and belief, one or more Interpleader Defendants reside within this judicial district.

## PARTIES

9. Wells Fargo is a national banking association with its main office in Sioux Falls, South Dakota. Wells Fargo is the Trustee under the Indenture.

10. Upon information and belief, Interpleader Defendant Waterfall Asset Management, LLC is a limited liability company organized and existing under the laws of the State of Delaware, and none of its members are citizens of South Dakota. Further, upon

information and belief, Waterfall serves as the investment manager for certain clients that own Senior Class A Notes issued by Tropic CDO IV Ltd.

11. Upon information and belief, Interpleader Defendant The Bank of New York Mellon is a bank organized under the laws of the State of New York with its principal place of business in New York, and is a citizen of New York.

12. Upon information and belief, Interpleader Defendant Cede & Co. ("Cede") is the nominee name of the Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York. Further upon information and belief, Cede is the registered Noteholder of record of the Notes at issue in this Interpleader Complaint, which Notes are held for the ultimate benefit of others.

## BACKGROUND

13. Wells Fargo, as Trustee, is party to the Indenture pursuant to which the Co-Issuers issued six classes of Notes to investors (the "Noteholders"). The Notes are secured by a portfolio of fixed income assets (the "Portfolio Collateral") owned by the Issuer, in a structure commonly known as a collateralized debt obligation ("CDO").

14. Wells Fargo holds the Portfolio Collateral as Trustee for the benefit of the Noteholders. In such capacity, Wells Fargo collects the proceeds payable on the Portfolio Collateral, and distributes available proceeds (the "Available Adjusted Collections") to Noteholders pursuant to Section 11.1 of the Indenture, referred to as the Priority of Payments or payment Waterfall, corresponding to varying degrees of risk.

15. Under the Indenture, the Class A-1L and Class A-2L (the "Senior Class A Notes") are to receive periodic interest payments on certain Payment Dates. If there is a default in the payment of the periodic interest due on the Senior Class A Notes, an Event of Default occurs pursuant to Section 5.1(a)(iii)(A) of the Indenture.

16.     The Indenture further provides that the Issuer may redeem Notes prior to the CDO's maturity date. In fact, Section 9.2 of the Indenture requires the Issuer to redeem all or a portion of the Notes "[i]f either the Interest Coverage Tests of the Overcollateralization Tests are not satisfied . . . or a Rating Agency Confirmation Failure Occurs." Beginning in 2008 and occurring on every Payment Date up until and including July 17, 2017, the Tropic CDO IV periodically failed the Overcollateralization Tests, and the Issuer periodically redeemed a portion of the Notes.

17.     Upon information and belief, BNYM and the Issuer entered into an interest rate swap agreement on or about November 18, 2004 (the "Swap" or "Swap Agreement") with a Notional Amount of $22 million and a delayed start date of October 15, 2009. The Swap Agreement is governed by the 1992 ISDA Master Agreement, which includes a Schedule and Confirmation exchanged between the parties for the purpose of confirming and evidencing the Swap. Under the Swap Agreement, the Issuer agreed to pay BNYM a fixed interest rate of 6.12 percent and BNYM agreed to pay Issuer a floating interest rate based on three month LIBOR,[2] both multiplied by the notional amount. Payments were to be made on the 15th day of each January, April, July, and October, and the amount payable to one party was to be "netted" or offset against the amount payable to the other. BNYM is the Calculation Agent under the Swap Agreement.

18.     Pursuant to Section 5 of the Swap Agreement, the Swap may be terminated upon the occurrence of a Termination Event or by one of several defined Events of Default, which include a "failure of a party to make, when due, a payment under this Agreement." Swap Agreement § 5(a)(i).

---

[2] "LIBOR" means "London Interbank Offered Rate" and refers to the interest banks have to pay other banks in order to borrow money in the London money market.

19. Pursuant to Part 1(n)(2) of the Schedule to the Swap Agreement, an Additional Termination Event occurs when there is a redemption of all or any portion of the Notes (the "Redemption Event"). If the Additional Termination Event occurs "in connection with a partial redemption of the Notes" the notional amount of the Swap must be reduced "to take into account the economic effect of such Event" by an amount reflecting the product of the Notional Amount thereof immediately prior to the Early Termination Date and a fraction, the numerator being the principal amount of Notes being redeemed and the denominator being the principal amount of Notes outstanding immediately prior to the Redemption Event.

20. Pursuant to Section 6(a) and 6(b) of the Swap Agreement, following an Event of Default or Termination Event, the other party may specify an Early Termination Date. Section 6(c)(ii) then provides, "[u]pon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries . . . will be required to be made" and Section 6(d)(i) follows that "on or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will . . . provide to the other party a statement . . . specifying any amount payable under Section 6(e)."

21. The Indenture requires the Trustee to act on behalf of the Issuer to enforce the Issuer's rights under the Swap Agreement after an Event of Default has occured under the Indenture. Specifically, Section 2.14 of the Indenture outlines that "[s]ubject to Section 15.2 hereof, the Trustee shall take all steps necessary to enforce the Issuer's rights under the Swap Agreement." In turn, Section 15.2(a)(iii), (v) provides that "the Issuer has Granted to the Trustee, for the benefit of the Noteholders, all of the Issuer's estate, right, title and interest in, to and under the Swap Agreement" including the right to both "take any legal action upon the breach of an obligation of the Swap Counterparty [and] do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; *provided* so long as no Event of Default has

occurred and is continuing hereunder, the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Swap Agreement without notice to or the consent of the Trustee."

## THE DISPUTE

**Partial Termination of the Swap Agreement**

22. On or about September 18, 2017, the Issuer and Trustee received from BNYM a notice of a Partial Termination of the Swap Agreement pursuant to Part 1(n)(2) to the Schedule to the Swap Agreement (the "Partial Termination Notice"). The Partial Termination Notice provided:

> Tropic CDO IV Ltd. is obligated to direct the Trustee to notify the Bank of New York Mellon of any redemption of any portion of the Notes (as defined in the Indenture). Any redemption of the Notes results in an Additional Termination Event under Part 5(n)(2) of the Schedule.
>
> The Bank of New York Mellon, in accordance with its rights as the sole Non-affected Party under Section 6 of the Agreement, hereby designates October 6, 2017 as the Early Termination Date with respect to all outstanding Transactions to the extent of the notional reduction required pursuant to Part 5(n)(2) of the Schedule. The Bank of New York Mellon will determine the amount payable either by The Bank of New York Mellon or Tropic CDO IV Ltd., as the case may be, in respect of such termination, and provide you with notice so such amount after the close of business on the Early Termination Date.

23. On or about October 6, 2017, the Issuer and the Trustee received from BNYM a Notice of Amount Due by the Issuer in respect of Partial Termination, dated October 6, 2017 (the "October 6 Notice of Termination Amount"). The October 6 Notice of Termination Amount provided that pursuant to Section 6(e) of the Swap Agreement and Part 1(n)(2) of the Schedule to the Swap Agreement, "the outstanding Transaction was partially terminated by the Partial Redemption Amount of $7,644,861, and Tropic CDO IV Ltd. is required to pay to The Bank of New York Mellon the Termination Amount of $3,166,500" (the "Partial Termination Amount"). The Partial Termination Amount was due and payable on October 16, 2017 (the "October

Payment Date"), subject to and in accordance with the terms and conditions of the Swap Agreement and the Priorities of Payment.

24. On or about October 12, 2017, BNYM provided an Amended Confirmation to the Swap Agreement (the "October 12 Amended Confirmation") that updated the terms and conditions of the Swap to reflect that the Notional Amount of the Swap was written down by $7,644,861 as of July 15, 2017.

25. The Available Adjusted Collections available for distribution on the October Payment Date were insufficient to pay in full both the interest due and payable on the October Payment Date with respect to the Senior Class A Notes and the Partial Termination Amount. Specifically, $77,869.84 and $67,886.15 of the interest due and payable on the Class A-1L and A-2L Notes, respectively, would remain unpaid (collectively, the "October Deferred Amount"), and $1,140,792.76 of the Partial Termination Amount due and payable to BNYM would remain unpaid. The shortfall in the payment of interest due on the Senior Class A Notes would result in an Event of Default under Section 5.1(a)(iii)(A) of the Indenture on the October Payment Date.

**Deferral of the Partial Termination Amount**

26. On or about October 16, 2017 (the October Payment Date), the Issuer received from BNYM a letter (the "Letter Agreement") consenting to a partial deferral of the Partial Termination Amount (together with any interest that may accrue thereon) on the October Payment Date, subject to and in accordance with the Priorities of Payment, to the next succeeding Payment Date. BNYM irrevocably consented to the delivery by the Issuer to the Trustee of an Issuer Order directing the Trustee to withhold the October Deferred Amount from the Partial Termination Amount and pay the October Deferred Amount to the Senior Class A Noteholders such that the payment to the Class A-1L and A-2L Noteholders would be $216,143.41 and $188.431.68, respectively.

27. On or about October 16, 2017, the Trustee received from the Issuer an Issuer Order—Distribution of Certain Amounts on October 16, 2017, dated October 16, 2017 (the "October 16 Issuer Order"). This Issuer Order, directed and instructed the Trustee as follows:

> 1. with the consent of the Swap Counterparty, evidenced by the letter agreement attached hereto as Exhibit A (the "Letter Agreement"), the Trustee shall withhold from the Issuer Default Swap Termination Amount an amount equal to $145,755.99 (the "Deferred Amount");
>
> 2. the Trustee shall distribute the Deferred Amount to the Holders of the Senior Class A Notes as follows: (a) first, to the payment to the Holders of the Class A-1L Notes of an amount equal to $77,869.84, and (b) second, to the payment to the Holders of the Class A-2L Notes, an amount equal to $67,886.15;
>
> 3. after deducting the Deferred Amount from the Available Adjusted Collections, the Trustee shall distribute $1,879,951.25 to the Swap Counterparty in respect of the Issuer Default Swap Termination Amount; and
>
> 4. that portion of the Issuer Default Swap Termination Amount consisting of the Deferred Amount $1,286,548.75, shall remain due and payable to the Swap Counterparty, and if not paid in full on the October 2017 Payment Date, shall accrue interest in accordance with the terms and conditions of the Swap Agreement, and shall be payable in accordance with Section 11.1 of the Indenture on each subsequent Payment Date until paid in full.

28. On or about the October 16, 2017 Payment Date, the Trustee distributed the Available Adjusted Collections consistent with the October 16 Issuer Order and the Priorities of Payment.

**BNYM Notices Non-Payment and Early Termination Date**

29. On or about October 17, 2017, the Issuer and the Trustee received from BNYM a notice of Non-Payment (the "Notice of Non-Payment") pursuant to the Swap Agreement. The Notice of Non-Payment provided:

> The Bank of New York Mellon hereby notifies the Issuer that the Issuer failed to make payment due under the Agreement on October 16, 2017 in the amount of $1,140,792.76, and such failure will constitute an Event of Default under Section 5(a)(i) of the Agreement if payment of such

amount, together with accrued interest at the Applicable Rate, is not made in full within three Local Business Days after the notice given by this letter.

30. On or about October 17, 2017, the Trustee published an Informational Notice (the "October 17 Notice") reflecting the information contained in the October 6 Notice of Termination Amount, the October 16 Issuer Order, and the Notice of Non-Payment. Waterfall and Cede received the October 17 Notice.

31. On or about October 20, 2017, BNYM provided an Amended Confirmation to the Swap Agreement (the "October 20 Amended Confirmation") that updated the terms and conditions of the Swap.

32. On or about October 20, 2017, the Trustee and the Issuer received from BNYM a Notice of Designation of Early Termination Date, dated October 20, 2017 (the "Notice of Early Termination Date") pursuant to the Swap Agreement. The Notice of Early Termination Date provided:

> Pursuant to our notice given on October 17, 2017, an Event of Default under Section 5(a)(i) of the Agreement has occurred. The Bank of New York Mellon, in accordance with its rights as the sole Non-Defaulting Party under Section 6 of the Agreement, hereby designates October 24, 2017 as the Early Termination date with respect to the Transaction. The Bank of New York Mellon will determine the amount payable either by The Bank of New York Mellon or the Issuer, as the case may be, in respect of such termination, and provide you with notice of such amount after the close of business on the Early Termination Date.

33. On or about October 20, 2017, the Trustee published an Informational Notice (the "October 20 Notice" and, together with the October 17 Notice, the "Notices") reflecting the information in the Notice of Non-Payment and Notice of Early Termination Date. Waterfall and Cede received the October 20 Notice.

34. On or about October 24, 2017, the Trustee and the Issuer received from BNYM a Notice of Termination Amount (the "October 24 Notice of Termination Amount"). The October

24 Notice of Termination Amount provided that the Issuer was required to pay BNYM a Termination Amount of $5,622,500 as well as a $1,286,548.75 Partial Redemption Amount, for a total of $6,909,048.75 (collectively, the "Final Termination Amounts") on January 15, 2018 (the "January Payment Date").

**Waterfall Disputes Early Termination Date**

35. On or about October 26, 2017, the Issuer and the Trustee received from counsel for Waterfall a letter, in connection with the Notices, requesting a copy of the Swap Agreement and all communications referenced in the Notices "particularly as they relate to the Designation of Early Termination Date and the alleged Event of Default under the Swap Agreement."

36. On or about October 27, 2017, the Trustee received from the Issuer an Issuer Order—Delivery of Certain Documents to Noteholders, dated October 27, 2017 (the "October 27 Issuer Order"). The October 27 Issuer Order directed and instructed the Trustee to deliver to certain Noteholders, including Waterfall, copies of the Swap Agreement and certain related information.

37. On or about October 27, 2017, the Trustee published an Informational Notice (the "October 27 Notice") providing notice to Noteholders that copies of the Swap Agreement, the Partial Termination Notice, the October 12 Amended Confirmation, the October 16 Issuer Order, the Letter Agreement, the Notice of Non-Payment, the Notice of Early Termination Date, the October 20 Notice, the October 20 Amended Confirmation, and the October 24 Notice of Termination Amount are posted at www.ctslink.com. Waterfall and Cede received the October 27 Notice.

38. On or about December 1, 2017, counsel for Waterfall wrote to the Trustee (the "December 1 Letter"), alleging that BNYM failed to comply with certain obligations under the

Swap Agreement and thus, the October 6, 2017 Early Termination Date was invalid. Specifically, the letter alleges that:

> [B]etween January 2010 and July 2017 (the "Redemption Period"), the Issuer appears to have redeemed Notes pursuant to Section 9.2 of the Indenture, but failed, along with [BNYM], to reduce the notional amount of the Swap in connection with the redemptions. Instead, the Issuer made payments to [BNYM] throughout the Redemption Period based on the full notional amount of the swap, causing the Trust to overpay [BNYM] (an incrementally higher amount) on each Payment Date during the Redemption Period. (footnotes omitted).

39. The December 1 Letter argues that because the Early Termination Dates "occurred 'simultaneous with' each Redemption Event during the Redemption Period . . . October 6, 2017 was not an Early Termination Date, no [Partial] Termination Amount of $3,166,500 was due . . . [and] [BNYM]'s declaration of an Event of Default under the Swap Agreement based on the Issuer's non-payment of this amount was likewise invalid." (footnote omitted). Thus, the Trust has paid "millions of dollars to [BNYM] in a manner not consistent with the Swap Agreement, and now threaten to trigger an Event of Default, which would cause irreparable harm to the Trust and its beneficiaries." The letter concluded by asserting that the Trustee has an obligation to enforce the Issuer's rights under the Swap Agreement pursuant to Section 2.14 of the Indenture, including challenging BNYM's declaration of an Early Termination Date and certain Termination Amounts pursuant to Section 15.2(a)(iii),(v) of the Indenture.

40. On or about December 29, 2017, counsel for Waterfall wrote to the Trustee, noting that the Trustee had taken no steps to enforce the Swap Agreement as against BNYM after receiving the December 1 Letter. The letter stated, "[i]f the Trustee fails to act to protect the Trust and enforce the Swap Agreement on or before January 10, 2018, Waterfall will take all necessary actions to protect the Trust and enforce its rights under the Indenture, including

pursuing claims against the Trustee for, among other things, the irreparable and substantial harm stemming from the Trustee's continuing action."

41. The Trustee has been engaged in discussions with BNYM and Waterfall regarding how to resolve the dispute. Despite indications from Waterfall and BNYM that they would come to a resolution, an agreement has not been reached.

42. BNYM asserts that the Final Termination Amounts are due and payable on January 15, 2018, subject to and in accordance with the terms and conditions of the Swap Agreement and the Priority of Payments.[3] Waterfall asserts that no amounts are owed to BNYM.

43. As described above, Wells Fargo faces irreconcilable demands as to whether to pay the Final Termination Amounts subject to and in accordance with the terms and conditions of the Indenture and the Swap Agreement. BNYM insists that Wells Fargo should pay the Final Termination Amounts. Waterfall, on the other hand, objects to the Final Termination Amounts, and has asserted that Wells Fargo could be liable if it pays the Final Termination Amounts rather than challenging BNYM's declaration of an Early Termination Date and the calculation of the Final Termination Amounts. Wells Fargo is therefore unable to determine, without exposing itself to risk of liability, what amounts, if any, are due to BNYM on the January Payment Date.

44. Wells Fargo is ready and willing to proceed in respect of the directions contained in BNYM's October 24 Letter and pay the Final Termination Amounts, if any, in the manner in which the Court directs. As a result of the present dispute, Wells Fargo cannot calculate the Final Termination Amounts purportedly due to BNYM on the January Payment Date. Accordingly, on the January Payment Date, the Trustee will pay the known interest amounts due to the Senior Class A Noteholders and escrow the remainder of the Available Adjusted Collections. To that

---

[3] As January 15, 2018 falls on a federal holiday, the payments are due to be made on January 16, 2018.

end, Wells Fargo will be retaining $1,236,441.10, which represents the balance of the Available Adjusted Collections after payment of the interest amounts to the Senior Class A Noteholders.

45. As Trustee, Wells Fargo has no interest as a claimant in the Final Termination Amounts that are the subject of this dispute, except to the extent of the costs and disbursements, including legal fees and expenses, with respect to this action, as may be awarded by the Court.

46. The above-entitled action is not brought by collusion with any of the Interpleader Defendants.

**PLEA FOR RELIEF**

**WHEREFORE,** Wells Fargo asks this Court:

(i) To order the Interpleader Defendants to interplead and to settle all claims related to the Final Termination Amounts that are the subject of this dispute among themselves and any other persons who claim or may claim an interest, beneficial or legal, in such assets;

(ii) To restrain Interpleader Defendants and all claiming through or acting with them, or claiming any interest in the Final Termination Amounts, from commencing or prosecuting any separate proceeding against Wells Fargo concerning or relating to the issues in this action;

(iii) To award Wells Fargo its costs and disbursements, including legal fees and expenses, with respect to this action and the distribution of proceeds in dispute; and

(iv) To award Wells Fargo such other and further relief as the Court may deem just, proper, and equitable.

Dated: New York, New York
       January 12, 2018

                                    ALSTON & BIRD LLP

By: *[signature]*

Alexander S. Lorenzo
Elizabeth A. Buckel
90 Park Avenue
New York, New York 10016
(212) 210-9400

*Attorneys for Interpleader Plaintiff Wells Fargo Bank, N.A., solely in its capacity as Trustee*