UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------------X
```

WELLS FARGO BANK, N.A., as Trustee,          :
                                             :
                    Interpleader Plaintiff,  :
                                             :
                                             :
                                             :
                    -against-                :
                                             :
WATERFALL ASSET MANAGEMENT, LLC,             :
THE BANK OF NEW YORK MELLON, and             :
CEDE & CO.,                                  :
                                             :
                    Interpleader Defendants. :

```
----------------------------------------------------------------X
```

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:  3/13/2019 |

1:18-cv-295-GHW

<u>MEMORANDUM OPINION</u>
<u>AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

Interpleader Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo") seeks the Court's assistance in determining how to distribute certain funds it controls in its role as trustee of a collateralized debt obligation ("CDO"). On one hand, the Bank of New York Mellon ("BNYM"), as party to an interest rate swap agreement (the "Swap Agreement") between itself and the issuer of the CDO, claims that certain funds under Wells Fargo's controls are owed to BNYM as payments owed pursuant to the Swap Agreement (the "*res*"). On the other hand, Waterfall Asset Management, LLC ("Waterfall") contends that BNYM is misinterpreting the Swap Agreement, that it will bring suit against Wells Fargo if Wells Fargo distributes the *res* to BNYM, and that BNYM is liable to the trust for alleged overpayments made to BNYM pursuant to the Swap Agreement. To resolve these competing claims, Wells Fargo served an interpleader complaint pursuant to Federal Rule of Civil Procedure 22. BNYM moved to dismiss the complaint, arguing that interpleader was inappropriate in this context. Wells Fargo and Waterfall opposed that motion, which is currently before the Court.

On the surface, this case bears many of the hallmarks of interpleader.  However, in this case Wells Fargo is not a disinterested party merely holding the *res* and seeking the Court's assistance in determining its distribution.  Rather, issues of trust governance predominate over issues of *res* distribution here.  Further, pursuant to Waterfall's competing theory for how the *res* should be distributed, Wells Fargo may have further obligations and/or liabilities which extend beyond distribution of the fund—indeed Wells Fargo's failure to live up to its contractual obligations may have been one of the root causes of the current dispute.  Additionally, the extension of interpleader into this fact pattern would set a precedent that essentially any question of trust governance is subject to interpleader determination so long as any specter of litigation risk regarding trust assets can be articulated by a weak-kneed trustee—undermining the principles of majority creditor control that underpin many indentures of this type.  As a result, neither law nor equity nor policy favor Wells Fargo's use of interpleader here.  Accordingly, for the reasons that follow, BNYM's motion to dismiss is GRANTED, interpleader is DENIED, and this case is dismissed.

## I.      BACKGROUND

### A.  Factual Background

#### 1.   The Contractual Context

The operative facts are not in dispute.  In late 2004, Tropic CDO IV Corp. ("Tropic"), brought to market a CDO governed by an indenture (the "Tropic CDO IV").  Amended Compl. ("AC") ¶ 1.  This case stems from that indenture (the "Indenture"), which was executed among Wells Fargo as Trustee, Tropic CDO IV Ltd., as Issuer, and Tropic, as Co-Issuer.  AC at 1.  The Indenture establishes six classes of notes subject to various terms and conditions established in the Indenture (the "Notes").  *See*, AC, Ex. A (ECF No. 53-1) (the "Indenture"), art. XI.  "The Notes are secured by a portfolio of fixed income assets (the 'Portfolio Collateral') owned by the Issuer."  AC ¶14.

2

In its capacity as Trustee, Wells Fargo holds the Portfolio Collateral and "distributes available proceeds (the 'Available Adjusted Collections') to Noteholders pursuant to Section 11.1 of the Indenture," otherwise known as the payment waterfall.  AC ¶ 15.  The payment waterfall is structured so that "lower-tiered creditors receive principal and interest payments only after the higher-tiered creditors are paid in full."  BNYM's Br. (ECF No. 60) at 7 (citing AC ¶ 15, Indenture § 11.1).  "Pursuant to the payment waterfall, the Indenture provides that senior Class A noteholders receive periodic interest payments on certain payment dates.  Once the Senior Class A noteholders are paid in full, any remainder flows to the subordinated noteholders as per the priority of payments."  *Id.* (citing AC ¶¶ 15-16, Indenture § 11.1) (internal citations omitted); *see* Indenture, Preliminary Statement.  Waterfall is the beneficial holder of certain junior subordinated notes. AC ¶ 11.  Defendant Cede & Co. ("Cede") is the registered noteholder for certain Notes which it holds for "ultimate benefit of others."  AC ¶ 13.[1]

On November 18, 2004,[2] contemporaneously with the execution of the Indenture, the Issuer entered into an interest-swap agreement with Tropic and the Bank of New York Mellon ("BNYM"). AC ¶ 2; *see* AC, Ex. B, (ECF No. 53-2) (the "Swap Agreement").  Wells Fargo, as Trustee, "is the Issuer's assignee under the Swap Agreement, and is required under the Indenture to take all steps necessary to enforce the Issuer's rights under" the Swap Agreement.  BNYM's Br. ¶¶ 8-9 (citing AC ¶ 23, Indenture §§ 2.14, 5.12(a)(iii) and (v)).[3]  Periodic payments made to BNYM as the Swap Counterparty are made prior to, and given priority over, any distribution of Available Adjusted

---

[1] Cede made clear at the conference held on May 12, 2018 that they are "just . . . a nominal party" and that they do not "take any position on the legal or factual issues that are before the Court."  May 12, 2018 Tr. 38:7-9.

[2] The Amended Complaint consistently presents the dates of the events in question in the form of "on or about" the date in question.  In the interest of readability, and without prejudice to Wells Fargo, the Court takes the liberty of presenting the facts with dates certain.

[3] As discussed below, Wells Fargo's rights and obligations as the Issuer's Swap Agreement assignee were licensed back to the Issuer, and there is a dispute as to whether that license was exclusive.  *See* § I(d), below.

Collections to Noteholders.  Indenture § 11.1.  Swap Termination Payments are made *pari passu* with payments of Available Adjusted Collections to the most senior noteholders, and "are to be requested on or as soon as reasonably practicable following the occurrence of an Early Termination Date.  AC ¶¶ 22; Indenture § 11.1; Swap Agreement § 6.

> Pursuant to Section 5 of the Swap Agreement, the Swap may be terminated upon the occurrence of a Termination Event or by one of several defined Events of Default, which include a "failure of a party to make, when due, a payment under this Agreement."  Swap Agreement § 5(a)(i).  Pursuant to Part 1(n)(2) of the Schedule to the Swap Agreement, an Additional Termination Event occurs when there is a redemption of all or any portion of the Notes (the "Redemption Event").  If the Additional Termination Event occurs "in connection with a partial redemption of the Notes" the notional amount of the Swap must be reduced "to take into account the economic effect of such Event" by an amount reflecting the product of the Notional Amount thereof immediately prior to the Early Termination Date and a fraction, the numerator being the principal amount of Notes being redeemed and the denominator being the principal amount of Notes outstanding immediately prior to the Redemption Event.

AC ¶¶ 20-21 (quoting Swap Agreement).  "BNYM is the Calculation Agent under the Swap Agreement."  AC ¶ 19.

"Pursuant to Section 6(a) and 6(b) of the Swap Agreement, following an Event of Default or Termination Event, the other party may specify an Early Termination Date.  Section 6(c)(ii) provides that, '[u]pon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries . . . will be required to be made" and Section 6(d)(i) follows that "on or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will . . . provide to the other party a statement . . . specifying any amount payable under Section 6(e).'"  AC ¶ 22 (quoting Swap Agreement).

### 2.  Partial Redemptions of Notes Between 2008 and July 17, 2017

The Indenture requires "Overcollateralization"—that is "that collateral values exceed the remaining principal on the notes principals on the notes with the exact amount of excess expressed a percentage that varies by class of notes."  BNYM's Br. at 8 (citing Indenture § 1.1).  In the event of

4

insufficient Overcollateralization, the Issuer is required to redeem all or a portion of the notes.  AC ¶ 18; BNYM's Br. at 8; Indenture § 9.2.  As discussed above, Partial Redemption of the Notes triggers an Additional Termination Event pursuant to Part 1(n)(2) of the Schedule to the Swap Agreement—and the Additional Termination Event triggers, *inter alia*, a reduction in the notional value of the Swap.  AC ¶¶ 20-21.

"Beginning in 2008 and occurring on every Payment date up and including July 17, 2017, the Tropic CDO IV periodically failed the Overcollaterization tests, and the Issuer periodically redeemed a portion of the Notes" (the "Partial Redemptions")  AC ¶ 18; BNYM's Br. at 12.  The Partial Redemptions should have triggered Redemption Events pursuant to the Swap Agreement— which would ultimately lead to Swap termination payments to BNYM and corresponding reductions of the notional value of the Swap.  AC ¶ 20-21; Swap Agreement, Schedule 1 Part 1(n)(2).  BNYM was contractually owed, but did not receive, notification of the approximately thirty Partial Redemptions at issue.  Swap Agreement Schedule 1 Part 1(n)(1); BNYM's Br. at 10, 14; *see* AC ¶ 24.

### 3.  BNYM's Response to the Undisclosed Partial Redemptions

On September 18, 2007, "the Issuer and Wells Fargo received from BNYM a Notice of a Partial Termination of the Swap Agreement" as to "all outstanding Transactions" as defined in the Swap Agreement.  AC ¶24.   BNYM informed the Issuer and Wells Fargo that that BNYM had become aware of numerous "pre-maturity, partial redemptions" which had consequences under the Swap Agreement.  BNYM Br. at 12.  BNYM noted that it was not provided with the "contractually required notice" of those Partial Redemptions, nor were the applicable outcomes under the Swap Agreement "triggered' by those events.   *Id.*  As the Calculation Agent under the Swap Agreement, BNYM determined that it was owed $3,166,500, and notified the Issuer and Wells Fargo to that effect on or about October 6, 2018.  AC ¶ 24-25.

On October 16, 2019, BNYM consented to a partial deferral ($145,755.99) of the sum owed, so as to avoid an "Event of Default under § 5.1(a)(iii)(A) of the Indenture on the October [16,] 2017 Payment Date."  AC ¶¶ 27-29.  However, the Issuer directed Wells Fargo to distribute only $1,879,951.25 to BNYM.  *Id.* ¶ 29.  As a result of the payment to BNYM, junior note holders, such as Waterfall, received no distribution on the October payment date.  AC ¶ 30.

On October 17, 2017, the Issuer and Wells Fargo received a notice of non-payment from BNYM, which notified them that if BNYM was not paid the outstanding balance of $1,140,792.76 plus accrued interest within three business days, an Event of Default would occur under the Swap Agreement.  AC ¶ 30.  No payment was made, and on October 20, 2017, BNYM notified Wells Fargo and the Issuer that an Event of Default had occurred and set October 24, 2017 as the Early Termination Date for the Swap Agreement.  AC ¶ 34.  On October 24, 2017, BNYM notified Wells Fargo and the Issuer that a Termination Amount of $5,622,500 as well as a Partial Redemption Amount of $1,286,548.75 (totaling $6,909,048.75) was due to BNYM on January 15, 2018 (together, the "*res*").  AC ¶ 36.

On October 17 and 20, 2018, Wells Fargo disseminated notices which provided the noteholders with information regarding the communications from BNYM described above.  AC ¶¶ 33, 36.  On October 26, 2018, Waterfall requested a copy of the Swap Agreement, which the Issuer directed Wells Fargo to provide to Waterfall, and other noteholders, shortly thereafter.  AC ¶¶ 37, 38.  Wells Fargo disseminated the Swap Agreement on October 27, 2018.  *Id.*

On December 1, 2018, counsel for Waterfall wrote to Wells Fargo, contending that BNYM had breached various provisions of the Swap Agreement, with the result that the Trust had overpaid BNYM.[4]  AC ¶¶ 40-41.  Waterfall asserted that Wells Fargo, as Trustee, has "an obligation to

---

[4] The notional value of the Swap impacts the formula for calculating Swap Payments.  AC ¶ 19.

enforce the Issuer's rights under the Swap Agreement pursuant to Section 2.14 of the Indenture, including challenging BNYM's declaration of an Early Termination Date and Certain Termination Amounts pursuant to Section 15.2(a)(iii), (v) of the Indenture." AC ¶¶ 40-41. On December 29, 2018, Wells Fargo received a subsequent letter from Waterfall noting that Wells Fargo had taken no steps to enforce the Swap Agreement against BNYM, and asserting that "'[i]f the Trustee fails to act to protect the Trust and enforce the Swap Agreement on or before January 10, 2018, Waterfall will take all necessary actions to protect the Trust and enforce its rights under the Indenture, including pursuing claims against the Trustee for, among other things, the irreparable and substantial harm stemming from the Trustee's continuing action.'" AC ¶ 42. Waterfall further asserted that "it has a valid claim against the Trustee because, notwithstanding the No Action Clause in the Indenture, there is a judicially created exception under New York law that permits a Noteholder to sue the Trustee." AC ¶ 42.

### B. Waterfall's Interpretation of the Swap Agreement

According to Waterfall, "it is the [T]rustee's obligation to enforce the [T]rust's right under the Swap Agreement by pushing back against Bank Of New York and saying, the [T]rust does not owe Bank of New York $7 million; to the contrary, Bank of New York owes the [t]rust several hundred thousand dollars." Tr. 24:6-10. Waterfall claims that "in its haste to recoup purported losses, [BNYM] overlooked the obvious fact that over eight years, the Trustee overpaid [BNYM]— based on a failure to reduce the Swap's notional value—out of funds that would have (and should have) been retained for the benefit of the Noteholders." Waterfall's Opp. (ECF No. 62) at 11. Waterfall's theory can be summarized as follows:

First, Waterfall contends that, pursuant to the Swap Agreement, whenever an Additional Termination Event occurs, "the Issuer and [BNYM] must reduce the notional amount of the Swap to 'take into account the economic effect of such [Redemption] Event." *Id.* (quoting Swap

7

Agreement, Schedule, Part1(n)(2)); *see* AC ¶ 21.  Waterfall further contends that "[t]he Early

Termination Date for the Redemption Event—*i.e*, the date on which the economic effect for which

the Redemption Event is be accounted—is 'deemed to occur simultaneous with the redemption.'"

*Id.* (quoting Swap Agreement, Schedule, Part 1(n)(2) & (n)(6)) (emphasis in original).  "On the Early

Termination Date:  (i) any payments or deliveries as to the redeemed amount must cease; and (ii)

BNY[M] and the Issuer must calculate the amount due with respect to the Redemption Event '[o]n

or as soon a reasonably practicable . . .'"  Waterfall's Opp. at 11 (quoting Swap Agreement §§ 6(c)(ii)

and (d)(i)).

　　　　Therefore, according to Waterfall, BNYM is "foreclose[d] from seeking termination

payments in connection with its belated discovery of prior Redemption Events" because any

"relevant Early Termination Dates occurred simultaneous with the nearly 30 Redemption Events

occurring from 2008 to July 2017, and those prior Redemption Events should have "reduce[d] the

notional amount of the Swap" at the time those events occurred.  Waterfall's Opp. at 11.

　　　　Furthermore, Waterfall asserts that "the Trustee has an obligation to enforce the Issuer's

rights under the Swap Agreement pursuant to Section 2.14 of the Indenture, including challenging

BNYM's declaration of an Early Termination Date and certain Termination Amounts pursuant to

Section 15.2(a)(iii),(v) of the Indenture."  AC ¶ 41 (citing correspondence from Waterfall).

　　　　Therefore, according to Waterfall's theory, Wells Fargo has a contractual obligation to

withhold the *res* from BNYM, *and*, beyond issue of distribution of the *res*, to seek "hundreds of

thousands of dollars" from BNYM on behalf of the Tropic CDO IV.

### C.  Waterfall's Purported Capacity to Threaten Litigation Against Wells Fargo

　　　　It is undisputed that Waterfall is a junior noteholder that has not employed and is not

employing any contractual right to direct the Trustee.  *See* Indenture, art. 1, §§ 1.1, 5.14 ("Requisite

Noteholders" may direct the Trustee); *see also* Tr. 22:8-10 ("we are not directing the Trustee"), 25:15-

16 ("There has been no formal direction as [R]equisite [N]oteholders of the trust to bring a lawsuit.") (both counsel for Waterfall); Waterfall's Opp. at 8 n.4.  Section 6.3 of the Indenture further specifies that the Trustee is "under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of *any of the* Noteholders pursuant to this Indenture unless such Noteholders have offered to the Trustee reasonable security or indemnity against all costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction."  Indenture § 6.13(e) (emphasis added). [5]  There is no indication in the record that Waterfall has provided Wells Fargo with any indemnity.  Accordingly, the Court concludes, and no party disputes, that the contractual provisions allowing for Noteholders, of any designation, to direct the Trustee to take the actions demanded by this one junior noteholder have not been engaged.

Nonetheless, Waterfall contends that if Wells Fargo does not "enforce the Issuer's rights under the Swap Agreement" then Waterfall will "pursue[] claims against the Trustee for, among other things, the irreparable and substantial harm stemming from the Trustee's continuing action."  AC ¶¶ 41-42 (quoting correspondence from Waterfall).

The Indenture contains a no-action clause, which prohibits noteholder-suits without formal demand that the Trustee "institute [p]roceedings."  Indenture § 5.9.  However, Wells Fargo and Waterfall both contend that the no-action clause poses no barrier to Waterfall's potential suit:

> [I]investors have been permitted to pursue breach on indenture claims against a trustee without complying with the requirements of a no-action clause.  Courts in this district have refused to strictly enforce the terms of no-action clauses under these circumstances because adherence to the typical demand requirement would be "futile;" a trustee cannot be expected to sue itself.

---

[5] The use of the phrase "any Noteholder" in § 6.13(e) of the Indenture is distinct from phrases such as "Majority Noteholders" and "Requisite Noteholder[s]" used elsewhere in the indenture."  *E.g.* Indenture §§ 1.1, 5.14, 6.3(f).

Wells Fargo's Opp. (ECF No. 63) at 15 (quoting *Ellington Credit Fund Ltd. v. Select Portfolio Servicing Inc.,* 837 F. Supp 2d 162, 186 (S.D.N.Y. 2011) (citing *Blackrock Core Bond Portfolio* v. U.S. Bank N.A., 165 F. Supp 3d 80, 92 (S.D.N.Y. 2016)).

BNYM contends that Waterfall's suit would be frivolous, but does not challenge Wells Fargo's and Waterfall's invocation of case law regarding the no-action clause.

**D. The Disputed Extent of Wells Fargo's Rights and Obligations Pursuant to the Swap Agreement Prior to an Event of Default**

The parties dispute whether the Issuer and Wells Fargo, as the Trustee, had "coextensive" rights and obligations pursuant to the Swap Agreement between 2008-2017.  Tr. at 16:2-5.

Article XV, § 15.2 of the Indenture vests "all of the Issuer's estate, right tile and interest in, to and under the Swap Agreement" in Wells Fargo.  However, that section goes on to provide that "so long as no Event of Default has occurred and is continuing hereunder, the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Swap Agreement, without notice to or the consent of the Trustee" and that "[t]he Trustee shall have no liability with respect to any act or failure to act by the Issuer under the Swap Agreement (provided that this sentence shall not limit or relieve the Trustee from any responsibility it may have under this Indenture upon the occurrence of an during the connivance of any Event of Default hereunder . . . ."  That language begs the question, is the license granted to the Issuer by Wells Fargo exclusive?

On this point, Wells Fargo and Waterfall differ.  "The [T]rustee takes the position that prior to an [E]vent of [D]efault, under [§]15.2 the [I]ssuer is tasked with making those determinations [regarding the Swap Agreement].  Waterfall has taken the position that there may be coextensive obligations."  Tr. at 16:2-5 (counsel for Wells Fargo).

It is undisputed that no Event of Default occurred during or prior to the 2008-2017 Partial Redemptions—with the corollary that the Issuer's license had not been revoked pursuant to § 15.2

of the Indenture.  It is also undisputed that BNYM did not receive notifications contractually required by the Swap Agreement—which is the root cause of the dispute before the Court. Accordingly, the dispute as to whether Wells Fargo had a "coextensive" obligation to issue such notifications looms large—and begs the question as to whether Wells Fargo shares any liability to which the Issuer may be exposed as the result of the failure to provide BNYM with the contractually required notifications of the Partial Redemptions at issue here.  Wells Fargo has a clear interest in the determination of that issue, which again goes beyond the distribution of the *res*.

### E.  Relevant Procedural History

On July 12, 2018, Wells Fargo served its amended-interpleader complaint pursuant to Federal Rule of Civil Procedure 22.  The pertinent parts of Wells Fargo's prayer for relief are reproduced below:

> (i) To order the Interpleader Defendants to interplead and to settle all claims related to the that portion of the Available Adjusted Collections that are the subject of this dispute among themselves and any other persons who claim or may claim an interest, beneficial or legal, in such *assets*;

> (ii) To restrain Interpleader Defendants and all claiming through or acting with them, or claiming any interest in the Available Adjusted Collections, from commencing or prosecuting any separate proceeding against Wells Fargo concerning or relating to the *issues* in this action[.]

(emphasis added).   The Court highlights the fact that the relief requested in not merely that the Court resolve competing claims as to the *res*—but also all issues concerning or related to the case as a whole.

Before the Court is BNYM's motion to dismiss the amended-interpleader complaint. (ECF No. 58).  By September 6, 2018 the motion was fully briefed.  Waterfall and Wells Fargo oppose the motion to dismiss; Cede takes no position as to the motion.

## II.    STANDARD

"Under Rule 22, interpleader is proper if the party requesting it is or may be exposed to double or multiple liability.  Rooted in equity, interpleader is a handy tool to protect a stakeholder from multiple liability and the vexation of defending multiple claims to the same fund.  Accordingly, what triggers interpleader is a real and reasonable fear of double liability or vexatious, conflicting claims . . . ."  *Washington Elec. Co-op., Inc. v. Paterson, Walke & Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir. 1993) (internal citations, quotations, and quotations marks omitted).

"'A prerequisite for permitting interpleader is that two or more claimants must be adverse to each other.'"  *Bradley v. Kochenash*, 44 F.3d 166, 168 (2d Cir. 1995) (quoting Wright & Miller, § 1705 When Interpleader Is Appropriate—Adverse Claimants Required, 7 Fed. Prac. & Proc. Civ. (3d ed.) ("Wright & Miller")).  "Thus, the protection against double or multiple liability provided by Rule 22 is protection only against double or multiple liability that is unjustifiable *because the plaintiff has but a single obligation*."  *Id.* (emphasis added) (internal quotation marks omitted).

"To determine whether an interpleader action is appropriate, therefore, a court must assess whether the stakeholder 'legitimately fear[s] multiple [liability] directed against a single fund, regardless of the merits of the competing claims.'"  *Fid. Brokerage Servs., LLC v. Bank of China*, 192 F. Supp. 2d 173, 178 (S.D.N.Y. 2002) (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Clemente*, 98-cv-756, 2001 WL 11070, at *5 (S.D.N.Y. Jan. 4, 2001).  In applying this test, a court need not analyze the merits of the claims because "[t]he stakeholder should not be obliged at its peril to determine which of two claimants has the better claim."  *Id.*  (quoting *John Hancock Mutual Life Ins. Co. v. Kraft*, 200 F.2d 952, 954 (2d Cir.1953).  Interpleader may be invoked due to the "the possibility of prospective claims."  *Id.; 6247 Atlas Corp. v. Marine Ins. Co., No. 2A/C*, 155 F.R.D. 454, 463 (S.D.N.Y. 1994) ("the case law consistently supports the notion that interpleader may be utilized even if some of the alleged claims have not yet been asserted").  The party seeking interpleader relief

bears the burden of establishing that [its] requirements are satisfied. *Great Wall De Venezuela C.A. v. Interaudi Bank*, 117 F. Supp. 3d 474, 482 (S.D.N.Y. 2015)

Interpleader is "a remedial device to be liberally construed. *6247 Atlas Corp.*, 155 F.R.D. at 461 (quoting *State Farm & Casualty Co. v. Tashire*, 386 U.S. 523, 533 (1967). "'Thus, the trend, both with regard to statutory revision and judicial interpretation, has been directed toward increasing the availability of interpleader and eliminating those technical restraints on the device that are not founded on adequate policy considerations.'" *Id.* (quoting 7 Charles A. Wright et al., Federal Practice and Procedure § 1704 at 500–501 (2d ed. 1986) (footnote omitted in original). However, "federal interpleader was not intended to serve the function of a bill of peace." *Tashire*, 386 U.S. at 537 (internal quotation marks omitted).

## III.   DISCUSSION

### A.   Wells Fargo has not satisfied the preconditions for interpleader.

Wells Fargo may not invoke interpleader here, because it is not at risk of multiple vexatious litigation as to a single fund, when it only owes a "single obligation." *Bradley v. Kochenash*, 44 F.3d 166, 168 (2d Cir. 1995); *see Tashire*, 386 U.S. at 537 ("[F]ederal interpleader was not intended to serve the function of a bill of peace.") (internal quotation marks omitted). At issue in this case is not merely the *res* which is under Wells Fargo's control in its role as Trustee, but also the scope and impact of Wells Fargo's potential "coextensive" obligations pursuant to the Swap Agreement, Wells Fargo's potential obligation to bring suit against BNYM for breach of the Swap Agreement, and BNYM's potential liability to the Trust in the event of such a suit. If the issues related to the *res* held by Wells Fargo were disentangled from the remaining issues, then interpleader as to the distribution of the *res* might be appropriate. However, as that is not Wells Fargo's demand here, interpleader is inappropriate.

Wells Fargo has plausibly alleged that it faces the risk of two potential suits as to the distribution of the *res*—one by BNYM for the sums BNYM claims are owed it under the Swap Agreement, and one by Waterfall for allegedly failing to enforce the Issuer's rights under the Swap Agreement, as required by the Indenture.  The potential suit by BNYM is the type of litigation threat typical in the interpleader context—BNYM merely seeks distribution of the *res* held by Wells Fargo in which Wells Fargo has disclaimed an interest.  *See, e.g. BNYM Trust Co., N.A. v. Telos CLO 1006-1 ltd.*, 274 F. Supp. 3d 191, 213 (S.D.N.Y. 2017) ("Trustee is a disinterested stakeholder" who "brought this interpleader action to preserve the funds for the benefit of the successful claimant."). However, the potential claims by Waterfall implicate concerns beyond the "single fund" held by Wells Fargo, and demonstrate that Wells Fargo has an interest in, and is seeking relief through, this litigation beyond the distribution of the *res*.

As described above, Waterfall's legal theory is that the prior and undisclosed Partial Redemptions which triggered the September 2017 Partial Termination also should have triggered reductions in the notional value of the Swap at the time those events occurred.  Such reductions never took place, and so, according to Waterfall, BNYM was not entitled to invoke a Partial Termination of the Swap Agreement, as the contractual preconditions had not been met—with the consequence that BNYM is not entitled to the *res* as Termination Payments.  Waterfall further contends that BNYM owes the trust "hundreds of thousands of dollars" because the notional value of the Swap, which determines the amounts paid to BNYM out of the trust, has been artificially inflated for years.

Waterfall's theory as to why Wells Fargo should not distribute the *res* cannot be disentangled from its theory as to why Wells Fargo is obligated to bring action against BNYM.  At base, Waterfall contends that BNYM was not entitled to invoke Partial Termination in the first instance, because the notional swap value of the Swap was not reduced "simultaneously" with prior Partial

14

Redemptions, as allegedly required by the Swap Agreement.  For the same reasons, Waterfall contends that BNYM is liable to the trust for its failure to reduce the notional swap value. Waterfall's Opp. 5-6.  Those claims cannot be disentangled—they are both the logical ramifications of Waterfall's interpretation of the Swap Agreement.

Additionally, Waterfall's position as to Wells Fargo's "coextensive" Swap Agreement obligations has broad potential ramifications which cascade beyond the issue of distribution of the *res* held by Wells Fargo.  The Indenture grants Wells Fargo all of the "Issuer's estate, right, title and interest in, to and under the Swap Agreement," which, according to Waterfall's theory, indicates that Wells Fargo inherited all of the Issuers rights and obligations—presumably including the obligation to issue notices of Partial Redemption.  Indenture, Article XV, § 15.2  Section 15.2 of the Indenture also provides for a license of those same rights to be provided to the Issuer—which is rescinded by an Event of Default.  *Id.*  Wells Fargo contends that, prior to an event of Default, the license is exclusive, meaning the rights and obligations of the Issuer under the Swap Agreement rested with the Issuer.  Tr 16:2-5.  Waterfall, however, contends that the license was not exclusive, and that Wells Fargo had "coextensive" rights and obligations with the Issuer prior to the Event of Default. *Id.*  Therefore, under Waterfall's theory, Wells Fargo may be subject to liability not just for its distribution of, or failure to distribute, the *res*, but also for mal or misfeasance as a result of its failure to exercise its "coextensive" rights and obligations under the Swap Agreement.

The root cause of the current dispute is that, pursuant to the Swap Agreement, the Issuer was required to notify BNYM of Partial Redemptions of the Notes.  However, despite approximately thirty "periodic" Partial Redemptions between 2008 and 2017, BNYM never received the contractually required notification of the Partial Terminations.  AC ¶¶ 2, 18, 24.  According to Wells Fargo's contractual interpretation, that failure lies with the Issuer.  However, under Waterfall's position, that fault would lie "coextensive[ly]" with the Issuer and Wells Fargo—which, if true,

could expose Wells Fargo to additional liability—unrelated to the distribution of, or failure to distribute, the *res*.

Therefore, this case is not merely about the distribution of a single fund held by Wells Fargo as Trustee.  Rather, this is a litigation also concerning at least (1) the governance of the Indenture— whether a single junior noteholder can require the Trustee to act without instruction from the Requisite Noteholders or an indemnity;  and (2) Wells Fargo's obligations as Trustee—which may include an obligation to bring suit against BNYM and may have included an obligation to issue notices regarding the 2008-2017 Partial Redemptions—and potential liability for any failure to meet those obligations.

Presumably recognizing the breadth of the potential issues raised here, and its interest in those issues, Wells Fargo has, in pertinent part, requested that the Court "restrain Interpleader Defendants . . . from commencing or prosecuting any separate proceeding against Wells Fargo *concerning or relating to the issues in this action*."  AC, Plea for Relief (emphasis added).  Similar requests for relief are not uncommon in the interpleader context, but here, this request is not mere boilerplate.  Instead, it is an express request to grant Wells Fargo a "bill of peace" for all potential issues in the case, and all of its potential liability with respect to them.  If it were not, Wells Fargo would have requested a freeze on other litigation regarding the "*assets*" not the "*issues*."  *Id.* (emphasis added).  Assuming, *arguendo*, that Waterfall's position as to the Swap Agreement and the Indenture is correct, if the Court granted Wells Fargo's requested "interpleader" relief here, it would inappropriately provide Wells Fargo with a procedural shield against its own potential mal or misfeasance.  Nor can the Court determine how to distribute the *res* held by Wells Fargo without deciding the other entangled aspects of this litigation—which are questions as to Wells Fargo's obligations as Trustee.  The Court declines to permit Wells Fargo to cower behind federal interpleader when the potentially serious issues as to Wells Fargo's governance of the trust

potentially predominate this litigation. *See* Wright & Miller, § 1704 ("If the court determines that a single action would not settle all the claims that are outstanding among the parties. . . then it may decide to deny the motion to interplead."); *Nat'l Sur. Corp. v. Globe Indem. Co.*, 331 F. Supp. 208, 210 (E.D. Pa. 1971) ("this Court will not grant interpleader where it feels no good will flow from the order.").

For all these reasons, the Court finds that the scope of this litigation goes well beyond the distribution of the *res* held by Wells Fargo, that Wells Fargo may owe multiple obligations beyond distribution of the *res*, that resolving the distribution of the *res* would require the Court to determine the nature and scope of those obligations, and that it would be inappropriate to provide Well's Fargo with a "bill of peace" against its own potential mal or misfeasance—with the corollary that interpleader is inappropriate here as a matter of law.

## B.  Neither Equity nor Policy Supports Wells Fargo's Use of Interpleader

Additionally, the Court has grave concerns regarding Wells Fargo's motivations for seeking interpleader, and the policy ramifications of granting interpleader in a case such as this.  While interpleader is "to be liberally construed," *6247 Atlas Corp.*, 155 F.R.D. at 461, "the availability of [interpleader] jurisdiction, however, [does] not require its exercise." *Truck-A-Tune, Inc. v. Re*, 23 F.3d 60, 63 (2d Cir. 1994) (discussing rule interpleader).  "Interpleader is an equitable proceeding" and the Court "has discretion" in determining whether the "equities . . . warrant further federal court adjudication." *Id.*; *see* Fed. R. Civ. Pro. 22(a) ("Persons with claims that may expose a plaintiff to double or multiple liability *may* be joined as defendants and required to interplead.") (emphasis added).  "[F]ederal interpleader was not intended to serve the function of a bill of peace." *Tashire*, 386 U.S. at 537 (internal quotation marks omitted).

By seeking to "restrain [the] Interpleader Defendants . . . from commencing or prosecuting any separate proceeding against Wells Fargo concerning or relating to the issues in this action,"

Wells Fargo is, in essence, asking for a bill of peace not just for any suit related to the distribution of the fund, but also to any potential suit by Waterfall or other noteholders regarding Wells Fargo's alleged failure to comply with its obligations as Trustee.  AC, Plea for Relief.  Interpleader is an appropriate vehicle for determining which, amongst adverse parties, is entitled to a disputed *res*—it is not a blanket "bill of peace" for trustees who, while disinterested in the distribution of the *res*, seek to interpose the aegis of interpleader between themselves and inextricably intertwined issues of their own potential mis or malfeasance. *See Tashire*, 386 U.S. at 537.

This concern is magnified by the possibility that Wells Fargo had coextensive Swap Agreement rights and obligations with the Issuer, as Waterfall has contended, in which case Wells Fargo may have additional liability for its failure to provide contractual notifications to BNYM, and/or to reduce the notional value of the Swap, when Partial Redemptions occurred.[6]  Wells Fargo's invocation of interpleader, if permitted, could sweep those potential claims in to a federal courthouse where they otherwise might not lie.  More troubling still, if Wells Fargo had a coextensive obligation to notify BNYM of the 2008-2017 Partial Redemptions, and failed to do so, then, far from being disinterested, Wells Fargo may have had an active hand in creating the events which led to BNYM's demand for payment, and ultimately this dispute.

Accordingly, equity weighs against permitting Wells Fargo to acquire a "bill of peace" as to its contractual obligations and liabilities through use of interpleader.  This concern is magnified by the fact that Waterfall's competing legal theory, without which there would be no justification for interpleader, tends to implicate Wells Fargo.

---

[6] The Court is especially concerned that it is Waterfall's theory that tends to implicate Wells Fargo, given that without Waterfall's threat of litigation, there would be no basis for interpleader.

Additionally, the Court has policy concerns regarding the wisdom of allowing interpleader in a case such as this.  Indeed, if interpleader is appropriate here, it is difficult to imagine any dispute as to an indenture in which interpleader would not be appropriate.

Counsel for Waterfall admitted at the May 12, 2018 initial pre-trial conference that this is case is "a departure from the classic interpleader," and the Court considers that view to be an understatement.  Tr. at 24:17-18.  Here, a junior noteholder, who does not even claim to have the contractual right to direct the Trustee, has threatened suit against the Trustee, despite the no-action clause in the indenture, in order to compel the Trustee to take a position under the Swap Agreement, which the junior note holder is not a party to nor had even read prior to the events immediately preceding this litigation.  If that is the basis for interpleader, then the mere specter of litigation by any noteholder, no matter how junior, as to any contract which with potential impact on the value of the trust, no matter how remote the junior noteholder's connection to that contract may be, is cause for the Trustee to cower behind interpleader, rather than govern the trust as it is contractually obligated (and paid) to do.  And while interpleader has been liberalized, the "liberalization of interpleader is aimed at eliminating those technical restraints on the device that are not founded on adequate policy considerations." *6247 Atlas Corp.*, 155 F.R.D. at 461.  The restraint imposed by the Court today is grounded in law, equity, and sound policy—federal interpleader is not a universal liability shield, nor a federal subsidy for the business of indenture trustees.  Even liberalized, the scope of interpleader has limits and is not a "universal bill of peace." *Tashire*, 386 U.S. at 537 (1967).

The outlier status of the facts presented in this litigation, and the gravity of the policy considerations at issue, are brought into clear relief when this case is compared to a similar case in which interpleader was granted in the Indenture context.  In *BNYM Trust Co., N.A., v. Telos CLO 1006-1 Ltd.*, BNYM, the trustee in that litigation, utilized interpleader to determine the distribution

of a contested fee potentially owed the collateral agent or a junior noteholder.  274 F. Supp. 3d 191

(S.D.N.Y. 2017).  At base, and unlike in this litigation, in *Telos* interpleader was appropriate because

the distribution of the single fund at issue would resolve the dispute amongst the litigants.  *Id.* at

213.  Additionally, the facts of the *Telos* mitigated against the policy considerations raised here in two

important ways.  First, the dispute involved determining which of two potentially applicable

payment waterfalls established under the governing indenture was applicable.  *Id.* at 210.  In other

words, the dispute in the *Telos*-case was grounded in the indenture at issue itself, rather than ancillary

agreements without direct connection to the junior noteholder threatening litigation, as is the case

here.  Second, Telos, as collateral agent, requested that the Trustee invoke interpleader, which at

least in part mitigates the Court's concerns regarding Wells Fargo's motivations for seeking

interpleader in the present case.  Finally, the *Telos* court held the "Trustee [was] a disinterested

stakeholder" in that case.  *Id.* at 213.  The Court cannot say the same here, as under several of the

posited interpretations of the Indenture and the Swap Agreement, Wells Fargo has obligations and

liabilities beyond the distribution of the *res*.

## IV.    CONCLUSION

The law does not require allowing interpleader here, as the dispute goes beyond Wells

Fargo's "single obligation" to distribute the res, and is instead predominated by issues as to Wells

Fargo's potential obligations as Trustee.  *See Bradley v. Kochenash*, 44 F.3d at 168 (2d Cir. 1995).

Further, equity does not support granting the relief sought by Wells Fargo, and the Court has grave

policy concerns about the wisdom of extending interpleader to the extent requested.  For all those

reasons, interpleader is DENIED, BNYM's motion to dismiss is GRANTED and this case is

dismissed.

The Clerk of Court is directed to terminate this case.

SO ORDERED.

Dated:  March 12, 2019
New York, New York

_____
GREGORY H. WOODS
United States District Judge